# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

EXECUTRIX of the ESTATE of )
MARK BULLER )
  )
      Plaintiff, )
v. )    C.A. No.    S18C-11-007 RHR
  )
PATRICK MONTAGUE, )
  )
      Defendant. )
  )

Submitted: December 6, 2021
Decided: March 4, 2022

## DECISION AFTER TRIAL

Patrick Scanlon, Esquire, Law Offices of Patrick Scanlon, Milford, Delaware, *Attorney for Plaintiff.*

Richard E. Berl, Esquire, Hudson, Jones, Jaywork & Fisher, Lewes, Delaware, *Attorney for Defendant.*

**ROBINSON, J.**

## I.   INTRODUCTION

This suit seeks repayment of a portion of a line of credit that Mark Buller ("Buller") and his estate (the "Estate") extended to Resort Professionals of Delaware, LLC (the "LLC"). Buller, and after his death, the Estate, loaned the LLC a total of $116,071.62.[1] The Estate now seeks repayment of 52% of that loan, with interest, from Defendant Patrick Montague ("Montague") who was the majority owner of the LLC.[2] The Court held a one-day bench trial in this matter on November 11, 2021. During trial, the Court heard testimony from the following witnesses: Adam Mahew ("Mahew"), Dawn Marton ("Marton"), Joselyn Buller, and Montague. Joint exhibits were offered by stipulation and admitted. The Court reserved decision for post-trial briefing. The parties have submitted post-trial briefs and the record is now complete.

## II.   STANDARD

In a bench trial, the court is the finder of fact and the parties must prove the elements of each claim by a preponderance of the evidence.[3] "A trial court may determine the weight and credibility to be accorded any witness,"[4] and has

---

[1] Joint Ex. U.

[2] The suit did not name the other members of the LLC, including the Estate, who collectively owned the other 48% of the LLC.

[3] *Pencader Associates, LLC v. Synergy Direct Mortgage Inc.*, 2010 WL 2681862, at *2 (Del. Super. Ct. June 30, 2010).

[4] *Jones v. Lang*, 591 A.2d 185, 188 (Del. 1991).

responsibility for resolving conflicts in the evidence.[5] To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[6]

## III.   <u>FINDINGS OF FACT</u>

In 2016, Montague, Buller, Marton, and Mahew discussed beginning a new business venture, a real estate group. Montague, a real estate agent with years of experience in the area, was the "talent"[7] and manager of the LLC. Buller, a close-to-retirement college professor, was to provide a line of credit and executive-level managerial expertise. Marton, Buller's stepdaughter, and Mahew, Marton's life partner, were to help run the day-to-day operations of the LLC. They hoped to learn the real estate business. Marton focused on marketing and Mahew oversaw the accounting and finances of the LLC.

The members registered the LLC on September 12, 2016, but did not sign the Operating Agreement ("the Agreement") until December 27, 2016. Montague held a 52% interest in the LLC, while Buller, Marton, and Mahew each held a 16%

---

[5] *Pencader Associates, LLC*, 2010 WL 2681862, at *3.
[6] *FlowShare, LLC v. GeoResults, Inc.*, 2020 WL 1921019, at *2 (Del. Super. Ct. Apr. 9, 2020).
[7] Trial Tr., Nov. 11, 2021 (D.I. 48) (hereinafter "Tr.) at 29 (Mahew).

3

interest in the LLC. Unfortunately, Buller passed away unexpectedly on February 24, 2017, less than two months after signing the Agreement.

Three portions of the Agreement are relevant to this litigation. First, in Paragraph 2.6 of the Agreement,[8] Buller provided a line of credit to the LLC of $168,000.00 to provide "seed money"[9] to cover initial expenses. The LLC provided limited liability to its members for all other obligations except for this line of credit:

> 2.3   Limitation of Liability.   Except as specifically set forth herein, no Member shall be required to contribute any additional capital to the Company or shall have any personal liability for the obligations of the Company, with the exception of the revolving line of credit provided to the Company by Member, Mark Buller. The Members shall be personally liable to Member, Mark Buller, for repayment of any balance due on the revolving line of credit based upon each Member's percentage interest in the Company.[10]

Second, both Buller and Montague were to obtain key-man[11] life insurance under Paragraph 12 of the Agreement:

> 12.   Insurance.   Patrick Montague and Mark Buller shall purchase a life insurance policy in the amount of $250,000.00 each within thirty (30) days of the execution of this Agreement. Said life insurance policy shall identify the Company as the beneficiary of the policy. Each Member shall provide evidence of the renewal of said policy annually. The Company shall reimburse the Members annually for the cost of said life insurance policies.[12]

---

[8] Joint Ex. A at ¶ 2.6.

[9] Tr. at 31 (Mahew).

[10] Joint Ex. A at ¶ 2.3.

[11] The parties and all witnesses referred to the insurance required by the Agreement as "key-man insurance." While there might be a more accurate or appropriate term, this decision will adopt the terminology used by the parties.

[12] Joint Ex. A at ¶ 12.

The first draft of the Agreement would have required all members to obtain this insurance, but Buller asked the attorney who prepared the Agreement to amend the Agreement so that only Buller and Montague were required to get life insurance.[13] There was conflicting testimony about the purpose of this life insurance. Marton and Mahew both testified that as to Buller, this insurance was limited to securing the line of credit Buller had extended.[14] Montague testified it was to retire Buller's line of credit in the event of Buller's death and to help fill any void Buller's death would create.[15] Marton and Mahew testified that the reason they were not required to purchase key-man insurance is because they were "not important enough"[16] to the operation of the LLC.

Third, several provisions in the Agreement allowed modification and amendment of the Agreement only when there was unanimous, written consent. Paragraph 7.1 of the Agreement provided, "[n]o member, without the prior written consent of all other members, shall… [a]mend the Certificate of Formation or the Operating Agreement which shall form and govern the Company."[17] Paragraph 14 of the Agreement stated "[n]either this Agreement nor the Certificate of Formation

---

[13] Joint Ex. L.
[14] Tr. at 29 (Mahew).
[15] Tr. at 76 (Marton).
[16] Tr. at 29 (Mahew); Tr. at 89 (Marton).
[17] Joint Ex. A at ¶ 7.1.

may be amended without the unanimous consent of the Members."[18] And finally, Paragraph 15.2 provided "[t]his Agreement contains the entire understanding of the parties. It may not be changed orally, but only by a writing signed by all of the parties."[19]

Neither Buller nor Montague obtained key-man life insurance within thirty days of the signing of the Agreement as required by Paragraph 12 of the Agreement. Montague testified that he began the project of obtaining key-man life insurance as early as August of 2016, several months prior to the signing of the Agreement. He met with his insurance agent and submitted to a physical examination.[20] His initial application was rejected because he inadvertently submitted an application for Pennsylvania insurance, not Delaware.[21] After signing the correct application, Montague received notice on February 21, 2017 that a rider of $250,000.00 to his existing life insurance had been approved and would go into effect on March 1, 2017.[22] This rider did not list the LLC as the beneficiary, but Montague testified that after the rider was approved, he intended to designate the LLC as the beneficiary.[23] Buller never obtained key-man insurance—and there was no evidence presented at trial that he attempted to obtain key-man insurance—before his death in February

---

[18] *Id.* at ¶ 14.
[19] *Id.*at ¶ 15.2.
[20] Tr. at 138 (Montague).
[21] Tr. at 139 (Montague).
[22] Tr. at 140–41 (Montague).
[23] Tr. at 143 (Montague).

2017. Montague testified he did not learn that Buller failed to obtain key-man insurance until the spring of 2018 after the benefit was never paid to the LLC. Montague also testified that he would not have agreed to join the LLC without Buller's agreement to purchase key-man insurance.[24] Additionally, Montague testified that he made a concession in exchange for Buller purchasing key-man insurance when he agreed "to share with the company 48 percent of all of the commissions that were in the pipeline, pending type of transactions, as well as 48 percent of all of the business that would come in during the time."[25]

A key issue in this dispute is whether there was an oral modification of the Agreement to relieve Buller of his obligation to obtain key-man insurance because it was too expensive. One of the stipulated exhibits at trial was an agenda and meeting minutes of a January 13, 2017 meeting.[26] The agenda included the following item: "Evaluate the cost of $100,000 life-insurance policy which covers the balance outstanding on the $168,000 line-of-credit."[27] In response to that agenda item, the minutes note, "[Buller] has a $144,000 life insurance policy with Saint Louis University. He will write a document stating that his estate will pay from this life

---

[24] Tr. at 132 (Montague).
[25] Tr. at 132–33 (Montague).
[26] Buller apparently drafted the agenda in advance and added the minutes after each agenda item during or after the actual meeting.
[27] Joint Ex. B.

7

insurance policy the residual owed on the $168,000 line of credit in the event of his death."[28]

On January 20, 2017, Buller created a document (the "Assignment") purporting to assign any proceeds from his life insurance to cover the remainder of the line of credit:

> In the event of my death, I authorize the transfer of funds to Resort Professionals from the proceeds of my Saint Louis University Life insurance policy to cover the difference between what I have paid to Resort Professionals by my day of death and the sum of $168,000 that I committed to contribute as a loan to Resort Professionals.
>
> Joselyn Buller or my durable power of attorney will oversee the transfer of funds at a frequency of no greater than once a month and no greater than $11,500 per payment as requested by Adam Mahew.[29]

The agenda/minutes of the January 20, 2017 meeting of the members include the note: "Send [Mahew] a document stipulating the payment from insurance policy any outstanding revolving line of credit in the event of death; Letter sent Jan. 21st."[30] The minutes indicate Montague was not present at this meeting.

After Buller's death in February 2017, Joselyn Buller, on behalf of the Estate, made four additional advances on the line of credit totaling $44,500.00. The business continued to run but at some point, it became clear to all the remaining members that the business model was not working. After about a year, Montague and Mahew met

---

[28] *Id.*
[29] Joint Ex. C.
[30] Joint Ex. D.

with the attorney who prepared the Agreement to ask her to dissolve the LLC. However, the attorney informed them that there could be conflicts of interest and advised each of them to find their own counsel.

The Estate brought this suit on November 6, 2018. Montague moved for summary judgment in October of 2019 arguing that there was a material breach of the Agreement when Buller failed to purchase the required life insurance. This Court denied that motion, determining that whether a breach is material or not is an issue of fact to be determined at trial.[31]

## IV.    **PARTIES' CONTENTIONS**

The Estate argues that Paragraph 2.3 of the Agreement makes Montague personally liable for 52% of the debt remaining on the line of credit that Buller and the Estate extended to the LLC. The Estate claims that Buller did not breach the Agreement by failing to obtain key-man insurance—the proceeds of which would have more than covered the debt of the LLC—because all the members of the LLC agreed to an oral modification of the Agreement that the Assignment would take the place of the $250,000.00 key-man insurance. The Estate also argues that even if Buller breached the Agreement, it was not a material breach. Alternatively, the Estate claims Montague acquiesced to the breach because Montague also did not get

---

[31] *Estate of Buller v. Montague*, 2020 WL 996883 (Del. Super. Ct. Mar. 2, 2020).

9

the required insurance within the agreed-upon thirty days and because he did not object to Buller's failure to get the insurance. Finally, the Estate argues Montague should be estopped from arguing that there was a material breach of the Agreement because he also failed to obtain the required insurance.

Montague argues that Buller's failure to purchase the $250,000.00 key-man life insurance policy as required by the Agreement is a material breach, which excuses him from being personally liable under Paragraph 2.3. Montague maintains that the Assignment was not a substitution or modification of the key-man policy required in the Agreement, but instead was a separate policy intended to secure the $168,000.00 line of credit that Buller owed to the LLC. Montague contends that the Agreement could only be modified with unanimous, written consent from the members of the LLC. Montague claims that he would not have agreed to be personally liable to the debts of the LLC without the security provided by the key-man insurance policy. Finally, he argues that he complied with the Agreement because he purchased key-man insurance, albeit after the thirty-day deadline had passsed.

## V.  **DISCUSSION**

For the following reasons, I find that the Estate cannot meet its burden to show that there was an oral modification of the Agreement that substituted the $144,000.00 in life insurance proceeds for the $250,000.00 key-man insurance

10

requirement. I also find that without the oral modification, Buller was in material breach of the Agreement, thereby excusing Montague from performance. Finally, Montague did not acquiesce to the breach through inaction and should not be estopped from arguing there was a breach because of his own failure to obtain key-man insurance.

## A. Was the Agreement Orally Modified?

The Agreement is very clear that it may be amended or modified only when there is unanimous and written consent from all members. A written contract, however, may be modified by a subsequent, oral agreement.[32] While oral modification of a written contract is generally permissible under Delaware law, it is "not favored for a host of pragmatic and public policy reasons"[33] An oral agreement that modifies a written contract must be specific, direct, and clear about the parties' intentions to change what they previously solemnized by formal document.[34] Marton and Mahew both testified that Montague orally agreed to a substitution of the key-man insurance because the parties learned that an insurance policy for Buller was cost-prohibitive. Montague acknowledges that the parties had conversations about the expense of the insurance but denies agreeing to a substitution.

---

[32] *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972).
[33] *Tunney v. Hilliard*, 2008 WL 3975620, at *5 (Del. Ch. Aug. 20, 2008), *aff'd*, 970 A.2d 257 (Del. 2009).
[34] *Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. Super. Ct. 1979).

The agenda and minutes of the January 13 meeting, along with the language in the Assignment, are insufficient to show there was an oral modification of the Agreement. The relevant agenda item for the January 13 meeting under the "weekly to-do list" for Buller states: "Evaluate the cost of $100,000.00 life-insurance policy which covers the balance outstanding on the $168,000.00 line of credit."[35] In the minutes following this agenda item, the question seems to be resolved with Buller agreeing to write a document directing his estate use the proceeds from his $144,000.00 life insurance policy to cover the line of credit.[36] In this section of the agenda and minutes, there is no mention of the key-man insurance and there is certainly nothing said about an agreement to replace the $250,000.00 key-man insurance policy with the $144,000.00 Assignment.[37] These excerpts indicate that the Assignment was intended to provide continued funding of the line of credit in the event of Buller's death, not a replacement for the key-man insurance. And, indeed, the Estate made several payments to the LLC after Buller's death in accordance with the Assignment.

---

[35] Joint Ex. B.
[36] *Id.*
[37] By contrast, in these same agenda/minutes, under the "weekly to-do list" for Montague, the agenda states "Purchase $xxx,xxx term-life insurance policy," and the minutes state "Has filled out the paper-work and is awaiting a physical." *Id.*

Without specific, direct, and clear evidence of an oral modification of the Agreement, the Estate does not meet the high burden required under Delaware law to prove the existence of that modification.

## B. Was There a Material Breach of the Agreement?

A party may be excused from performing under a contract where the other party is in material breach of that contract.[38] Additionally, "[t]he party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform."[39] Here, Buller's breach in not purchasing key-man insurance is material, so his Estate cannot now compel Montague to repay his portion of the debt pursuant to Paragraph 2.3.

In *BioLife Solutions, Inc. v. Endocare, Inc.*, the Chancery Court provided guidance for assessing when a breach is material, thus justifying non-performance for the other party:

> The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by weighing the consequences in the light of the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.[40]

---

[38] *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003).

[39] *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013), *aff'd sub nom.*, 108 A.3d 1225 (Del. 2015).

[40] *BioLife Sols.*, 838 A.2d at 278.

Section 241 of the *Restatement (Second) of Contracts,* sets out several factors to consider when determining whether a breach is material:

> These factors include: (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[41]

After hearing testimony and weighing the evidence presented, I find that these factors weigh in favor of Montague.

Simply put, if Buller had obtained the life insurance as required in Paragraph 12 of the Agreement, the debts of the LLC would have been covered, Montague would not have risked being personally liable to the LLC under Paragraph 2.3, and there would have been enough money left over to possibly allow for the continuation of the business. Montague testified that at the time of the formation of the LLC, he was working on various deals in different stages of fruition. Even though he did not have to do so, he shared his portion of those deals with the LLC. He was very clear—and I find this testimony credible—that he would not have given up that income and joined the LLC if he was not protected by the key-man insurance provision.

---

[41] *Restatement (Second) of Contracts* § 241 (1981).

Montague reasonably expected that advances on the line of credit would not just be guaranteed but repaid by the key-man insurance in the case of Buller's death. He was also deprived of the excess of that insurance beyond repaying the line of credit. By requiring the purchase of key-man insurance, the members of the LLC agreed that Buller was someone essential to the business's success. Although we will never know what may have been, the testimony showed that the LLC had, at least, a greater chance of success had Buller survived.

Montague cannot now be adequately compensated for the benefit of Buller's failure to obtain the key-man insurance. And it is impossible for Buller to now cure his failure to obtain key-man insurance. Montague testified that the guarantee that the key-man insurance would cover debts of the LLC induced him to give up 48% of his commission sales that were "in the pipeline" when the LLC first formed. Montague also credibly testified that he would have never signed the Agreement without the security provided by the requirement that Buller obtain key-man insurance.

All these considerations weigh in favor of Montague's claim that Buller's failure to purchase key-man insurance is a material breach.

C. **Acquiescence and Estoppel**

The Estate argues that Montague acquiesced to Buller's failure to obtain key-man insurance by continuing to operate the LLC and that the additional draws on the

line of credit and the two partial payments made on that debt by the LLC are inconsistent with Montague's contention that he considered Buller's act in failing to purchase key-man insurance a material breach. Acquiescence requires that the party complaining of an act (1) has full knowledge of his rights and all material facts, and (2) remains inactive for a considerable time, or gives recognition to the act, or conducts himself in a manner inconsistent with any subsequent repudiation of the act, leading the other party to believe the act has been approved.[42] Montague testified that he did not know of Buller's failure to purchase key-man insurance until almost a year after Buller's death. The Estate argues that, as manager of the LLC, Montague should have seen that the LLC had never made any payments for the key-man insurance reimbursing Buller. But it was Mahew, not Montague, who handled the finances and kept the financial accounts of the LLC. Additionally, the Agreement only required Buller and Montague show proof of the insurance annually to get reimbursed. With this annual notice in mind, it follows that Montague would not have the knowledge of the failure to purchase for the duration of one year. The Estate cannot show that Montague had full knowledge of all material facts necessary to show an acquiescence to the breach.

---

[42] *Devine v. MHC Waterford Estates, L.L.C.*, 2017 WL 4513511, at *3 (Del. Super. Ct. Oct. 10, 2017) (citing *Tenneco Automotive Inc. v. El Paso Corp.,* 2004 WL 3217795, *12 (Del. Ch. Aug. 26, 2004)).

The Estate also argues that Montague should be estopped from claiming Buller's failure to obtain key-man insurance was a material breach because Montague also failed to obtain key-man insurance by that time. Montague began the steps to obtain the key-man insurance through obtaining a rider on his existing policy. This was approved in February 2017 and went into effect shortly thereafter. Montague cured his failure prior to this issue becoming germane. Montague is not estopped from advancing an argument of material breach.

## VI.  CONCLUSION

If Buller had complied with the obligations set forth in the Agreement, the debt of the LLC would be retired and there would be no need for this litigation. The Estate has attempted to shift the burden of 52% of the loan onto Montague. The only reason this debt exists today is because of Buller's own failure to abide by the obligation of the Agreement.

For the foregoing reasons, I find in favor of Defendant Patrick Montague.

**IT IS SO ORDERED.**