# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAREXEL INTERNATIONAL (IRL) LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. N19C-07-103 PRW CCLD |
| XYNOMIC PHARMACEUTICALS, INC., | ) ) ) | |
| Defendant. | ) ) | |

Submitted: May 26, 2021
Decided:  July 21, 2021

## DECISION AFTER TRIAL

A. Thompson Bayliss, Esquire, April M. Kirby, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Kurt S. Kusiak, Esquire, FITCH LAW PARTNERS LLP, Boston, Massachusetts; Martin F. Mahoney, II, Esquire, Parexel International, Newton, Massachusetts. *Attorneys for Plaintiff Parexel International (IRL) Limited.*

Lisa Zwally Brown, Esquire, Samuel L. Moultrie, Esquire, GREENBERG TRAURIG, LLP, Wilmington, Delaware. *Attorneys for Defendant Xynomic Pharmaceuticals, Inc.*

**WALLACE, J.**

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is a breach-of-contract action through which Plaintiff Parexel International (IRL) Limited seeks damages from Defendant Xynomic Pharmaceuticals, Inc., for the latter's failure to pay numerous outstanding invoices.[1]

In the spring of 2018, Xynomic engaged Parexel to launch and conduct global clinical trials in support of Xynomic's development of Abexinostat, a cancer treating biopharmaceutical product.[2]  Parexel and Xynomic memorialized their contractual relationship in a Master Services Agreement ("MSA").[3]  The MSA governed the parties' performance of specific services through the execution of work orders.[4] In July 2018, the parties executed their first work order, Work Order for Project No. 240681 ("Work Order 1"), and in December 2018, the parties executed a second, Work Order for Project No. 241812 ("Work Order 2").[5]

On July 12, 2019, following Xynomic's default on numerous invoices, Parexel brought suit against Xynomic.[6]

---

[1]  Am. Compl. ¶¶ 97-112, Oct. 31, 2019 (D.I. 15).

[2]  *Id.* ¶ 6.

[3]  *Id.*

[4]  *Id.* ¶ 7.

[5]  *Id.* ¶¶ 13, 71.

[6]  Compl. ¶¶ 80-82, July 12, 2019 (D.I. 1).

Soon after, Parexel and Xynomic both filed Motions for Summary Judgment.[7] Parexel sought summary judgment on Counts I (Breach of Work Order 1) and II (Breach of Work Order 2) of its Amended Complaint, contending there were no factual issues in dispute.[8] Xynomic sought summary judgment on both of Parexel's claims, arguing the Court lacked subject matter jurisdiction over this suit.[9]

In September 2020, the Court denied Xynomic's subject matter jurisdiction challenge as moot, and denied Parexel's summary judgment motion as to Count I (Breach of Work Order 1), finding that Parexel had, as the record then stood, "not met its burden in showing that it performed or was ready to perform its obligations under the MSA and the First Work Order before Xynomic allegedly breached."[10] As to Count II (Breach of Work Order 2), however, the Court found no dispute of material fact existed     and granted Parexel's motion.[11]

Consequently, the only issue remaining here is Count I (Breach of Work Order 1) of Parexel's Amended Complaint.

---

[7]   Parexel's Mot. for Partial Summ. J., Dec. 23, 2019 (D.I. 21); Xynomic's Mot. for Summ. J., Jan. 24, 2020 (D.I. 24).

[8]   Parexel's Mot. for Partial Summ. J. at 12.

[9]   Xynomic's Mot. for Summ. J. at 7.

[10]   *Parexel Int'l (IRL) Ltd. v. Xynomic Pharms., Inc.*, 2020 WL 5202083, at *7 (Del. Super. Ct. Sept. 1, 2020).

[11]   *Id.*

## II.  THE TRIAL

The Court conducted a three-day bench trial.  And the case was deemed fully submitted for decision after the parties submitted their post-trial briefing.[12]

During trial, the Court heard from and considered the testimony of the following witnesses:

| | |
|---|---|
| Francesco Paronelli | Joseph Scott |
| Vineeta Prasad | Wentao Jason Wu |
| Erin Williams | Sophia Paspal |
| Bradley McClellan | Yinglin Mark Xu |
| Ronald Kraus | |

The parties also submitted an extensive number of exhibits, most of which were admitted without objection and are cited herein by their designations as joint exhibits.[13]

## III.  FINDINGS OF FACT

It is difficult at times in the trial of certain actions to fully and cleanly segregate findings of fact from conclusions of law.  To the extent any one of the Court's findings of fact here might be more appropriately viewed as a conclusion of law, that finding of fact may be considered the Court's conclusion of law on that point.[14]

---

[12]  D.I. 76.

[13]  Joint Trial Exs. List, Jan. 26, 2021 (D.I. 64).

[14]  *See Facchina Constr. Litigs.*, 2020 WL 6363678, at *2 n.12 (Del. Super. Ct. Oct. 29, 2020) (collecting authority).

## A. THE PARTIES AND THE DRUG ROLL OUT.

Parexel is an Irish corporation with its headquarters in Billerica, Massachusetts. Parexel is a clinical research organization providing its clients with "clinical research, drug development, medical communications, data management, [and] market access planning" services.[15]

Xynomic is a Delaware corporation with its headquarters in Shanghai, China.[16] Xynomic is in the business of "develop[ing], manufactur[ing], and marketing biopharmaceutical oncology products."[17]

Relevant here, Xynomic was in the process of rolling out its "most critical project"—Abexinostat, a cancer treating drug.[18] During this time, Xynomic had been conducting the clinical trial phase of its roll out and was seeking a clinical research organization to assist with phase three of its clinical trial.[19]

## B. THE MSA, WORK ORDER 1, AND THE SUBSEQUENT BREAKDOWN OF THE PARTIES' RELATIONSHIP.

In April 2018, the parties executed the MSA through which Parexel was to

---

[15]  Am. Compl. ¶ 1.

[16]  *Id.* ¶ 2; *About Us*, XYNOMIC PHARMA, http://xynomicpharma.com/en/506-11/ (last visited July 20, 2021).

[17]  Am. Compl. ¶ 2.

[18]  Trial Tr., Jan. 27, 2021 AM (Xu), at 120 (D.I. 74).

[19]  *Id*. at 121-22, 197.

provide clinical research services for Abexinostat's phase three clinical trials.[20] The MSA structured the parties' arrangement in subsequently executed work orders, which outlined details and terms of services to be performed.[21]

The MSA required Xynomic to pay for three things: (1) Parexel's service fees; (2) Parexel's out-of-pocket expenses; and, (3) any other payments Parexel and its affiliates would make to third parties in connection with services under the work orders ("pass-through fees").[22] The MSA also prescribed invoicing procedures: (1) the undisputed portions of any invoice for services performed under the MSA and any work order were due thirty (30) days from receipt; (2) any disputed invoiced items had to be raised, with notice to Parexel in writing and with specificity, within ten (10) business days of the invoice date; (3) any invoiced items that were not disputed by Xynomic within ten (10) business days of the invoice date were deemed approved; and, (4) interest was to be paid on any unpaid invoice at the rate of one percent (1%) until such invoice is paid in full.[23]

---

[20] Pretrial Stip. Order ¶ 20, Jan. 7, 2021 (D.I. 60) (hereinafter "PSO"); Joint Exhibit (hereinafter "JX")-252 (MSA).

[21] PSO ¶ 22; JX-252 (MSA § 2.1).

[22] PSO ¶ 24; JX-252 (MSA § 4.1).

[23] JX-252 (MSA § 4.2).

In July 2018, the parties executed Work Order 1 for services related to Abexinostat's clinical research studies.[24] The official name of the study was "Protocol XYN602: A Randomized, Phase 3, Double-blind Placebo-controlled Study of Pazopanib With or Without Abexinostat in Patients with Locally Advanced or Metastatic Renal Cell Carcinoma."[25] This study was expected to take place over a five-year period ending in October 2023.[26]

Exhibit A of Work Order 1 outlined the scope and specifications of the services Parexel was to perform under Work Order 1.[27] Of significance to Xynomic, Exhibit A laid out the "three most important parameters" of the scope of Work Order 1:[28]

(1) The nine countries to be included in the study: China, Czech Republic, France, Italy, South Korea, Poland, Spain, the United Kingdom, and the United States.

(2) The number of test sites in each country, totaling seventy-five: twenty in China, three in Czech Republic, six in France, nine in Italy, five in South Korea, seven in Poland, five in Spain, five in the the United Kingdom, and fifteen in the United States.

---

[24] PSO ¶ 24; JX-15 (Work Order 1) (effective Sept. 3, 2018).

[25] JX-15 (Work Order 1).

[26] JX-15 (Work Order 1, Ex. C) (estimated timeline spanning from Apr. 2018 to Oct. 2023).

[27] JX-15 (Work Order 1, Ex. A).

[28] Trial Tr., Jan. 27, 2021 AM (Xu), at 128. These parameters were highly important to Xynomic because the "ultimate end points that would allow the drugs to be approved or disapproved by agencies, including [the] FDA, are the number of patients." *Id.*

(3) The number of patients enrolled—534 screened patients and 413 patients enrolled in the study.[29]

Exhibit B of Work Order 1 set out the tasks and responsibilities to be undertaken by each party.[30] And Exhibit C set forth estimated timelines for the services Parexel was to provide under Work Order 1.[31]

Work Order 1 provided for $41,279,270 of payments to Parexel throughout the five-year course of the study.[32] Together, the MSA and Work Order 1 provided for three types of payments:

(1) Milestone Payments—which were only due upon Parexel's completion of the identified achievements in Exhibit G of Work Order 1;

(2) Monthly Payments—which amounted to sixty-three monthly payments of $187,498 from August 2018 to October 2023, and were due regardless of whether work was actually done; and,

(3) Pass-through and Investigator Fees—which Xynomic was to make in the form of two advance payments of $1 million upon the execution of Work Order 1.[33]

---

[29] JX-15 (Work Order 1, Ex. A).

[30] JX-15 (Work Order 1, Ex. B).

[31] JX-15 (Work Order 1, Ex. C).

[32] JX-15 (Work Order 1 at 1).

[33] JX-252 (MSA § 4.1); JX-15 (Work Order 1, Ex. G).

-7-

Shortly after the execution of Work Order 1, the parties' relationship began to deteriorate. Most notably, Xynomic became increasingly dissatisfied with Parexel's performance in China.[34] Related to the studies to be conducted in China, Xynomic criticized: the communication between Parexel's global team and its local team in China; Parexel's lack of effort regarding patient recruitment; mistakes made in key documents; and the Clinical Research Assistant hired by Parexel.[35] In late August 2018, Xynomic and Parexel representatives met to discuss the issues regarding the China study.[36] The parties were unable to resolve the issues raised, leading to Xynomic's eventual termination of Parexel's services in China on April 16, 2019.[37]

From October 31, 2018, to June 18, 2019, Parexel sent Xynomic twenty-five invoices for services rendered, milestones accomplished, and pass-through fees

---

[34] Xynomic Post-Trial Br. at 11, Mar. 10, 2021 (D.I. 69). Xynomic now criticizes Parexel's performance outside of China as well. *See, e.g., id.* at 13-19 (identifying the issues including: Parexel's failure to conduct Site Initiation Visits; errors and inconsistencies made in the Informed Consent Form given to trial participants; Parexel's inability to record data according to regulatory requirements; failure to properly submit regulatory reports and applications; failure to initiate Sites and enroll patients in the United Kingdom, Italy, France, and Czech Republic; and failure to adhere to Exhibit C's expected timeline).

[35] Trial Tr., Jan. 26, 2021 (Wu), at 218-20, 230 (D.I. 74).

[36] JX-255 (XYN-602 F2F Meeting Presentation).

[37] JX-274 (Apr. 16, 2019 e-mail terminating Parexel's services in China). Even still, the parties executed a change order to Work Order 1 to reflect additional responsibilities taken on by Parexel just the day before Xynomic's termination notice. JX-111 (Form of Change Order).

incurred and expected under Work Order 1.[38]  Xynomic did not object to any of the

amounts reflected in any of the invoices within ten (10) days of the invoice date.[39]

Between March and May 2019, Xynomic and Parexel attempted to implement new

payment plans for the full payment of Xynomic's outstanding balance, but Xynomic

failed to meet the payment schedules it proposed.[40]  Following these defaults,

Parexel informed Xynomic that it would continue its support related to patient safety

for current active sites and patients, but that it would not initiate any additional

sites.[41]

---

[38]  PSO ¶¶ 31-84. This does not include two invoices for advances toward pass-through fees pursuant to Exhibit G of Work Order 1. Parexel Post-Trial Br. at 8, Mar. 10, 2021 (D.I. 70).

[39]  PSO ¶¶ 33-84.

[40]  PSO ¶ 109; JX-106 (E-mail from Y. Mark Xu ("Xu"), Chairman, Chief Exec. Officer, & President, Xynomic Pharms., Inc., to Joe Scott ("Scott"), Senior Vice President of Fin., Parexel Int'l (IRL) Ltd., Re: Xynomic Pharmaceuticals - Discussion on Outstanding Payments (Mar. 12, 2019)); JX-117 (E-mail from Xu, to Scott, Re: Proposed plan to pay off outstanding invoices (Apr. 6, 2019)); JX-119 (E-mail from Xu, to Scott, Re: Proposed plan to pay off outstanding invoices), (Apr. 10, 2019)); JX-121 (Xu and Scott planning via e-mail a time to discuss a proposed payment plan).

[41]  JX-137 (E-mail from Ron Kraus ("Kraus"), Corp. Vice President, Parexel Int'l (IRL) Ltd., to Xu, Re: Follow up (Apr. 18, 2019)) ("As we agreed, PAREXEL will begin a slow down process regarding services on the project due to the impact of the substantial overdue amount and to mitigate PAREXEL's further financial risk. With immediate effect we plan to continue our support related to patient safety for the current actives [*sic*] sites and patients but will no longer initiate additional sites or continue with the pending protocol amendment submissions."); JX-137 (E-mail from Xu, to Kraus, and Scott, Re: Follow up (Apr. 22, 2019)) ("I will advise my project team regarding the slowdown of activities.").

In May 2019, Xynomic made two $500,000 payments to Parexel. The parties agreed this $1,000,000 would be applied to Xynomic's oldest outstanding invoices.[42] Also in May 2019, after Xynomic continued to miss its scheduled payments, Parexel informed Xynomic that it would not initiate any new sites until Xynomic became current on its outstanding balance.[43] On May 24, 2019, Parexel sent Xynomic a Notice of Material Breach of the MSA and Work Order 1.[44] MSA Section 5.2 required Xynomic to cure its material breach within thirty (30) days from receipt of that notice.[45] Xynomic didn't. Instead, Xynomic continued to make empty promises of payment.[46]

---

[42] JX-179 (E-mail from Xu, to Scott, Re: Xynomic SOA as of 6-3-2019 (June 10, 2019)); Trial Tr., Jan. 26, 2021 (McClellan), at 49-50.

[43] JX-147 (E-mail from Kraus, to Xu, Re: Follow-up (PAREXEL) (May 4, 2019)) ("We remain very concerned with the outstanding balance due to PAREXEL and are disappointed by Xynomic's failure to make the $2.5M payment by April 30th that you agreed to last month. We have been involved in discussions regarding the substantial past due amounts for months now and this is not the first instance in which promised payments by Xynomic had not been made. As a result, we must stop all enrollment activities until we receive payment of all open invoices.").

[44] JX-334 (Letter from Martin F. Mahoney II ("Mahoney"), Corp. Vice President, Assoc. Gen. Couns. & Chief Compliance Officer, Parexel Int'l (IRL) Ltd., to Chasey Zhang ("Zhang"), Vice President of Global Strategic Sourcing & Operations, Xynomic Pharms., Inc., Re: Notice of Material Breach of Master Services Agreement (May 24, 2019)).

[45] JX-252 (MSA § 5.2).

[46] JX-167 (E-mail from Xu, to Scott, Re: Discount (June 1, 2019)) (Xu proposing to pay of all invoices by June 28, 2019); JX-180 (E-mail from Xu, to Scott, Re: Status (June 12, 2019)) (Xu stating that Xynomic remained "committed to pay the outstanding invoices by the end of June").

In July 2019, Parexel brought this action seeking payment owed under the MSA and Work Order 1.[47] In September 2019, Parexel ceased all Work Order 1's non-patient-safety work.[48] Xynomic tried to get Parexel to resume its work under Work Order 1 by continuing to promise full payment of its outstanding invoices.[49] These attempts were unsuccessful and on October 31, 2019, Parexel amended its complaint in this action to include additional incurred invoices Parexel had submitted to Xynomic.[50] Parexel is now seeking the total unpaid remainder on those invoices—$5,530,579.30—and corresponding interest.[51]

## C. TRIAL TESTIMONY.

Parexel's first witness in this three-day trial was Francesco Paronelli, a Senior Project Leader with Parexel, who explained the MSA and Parexel's role in Xynomic's clinical trials.[52] Mr. Paronelli testified that the parties signed a change

---

[47] Compl. (D.I. 1).

[48] Trial Tr., Jan. 25, 2021 (Prasad), at 214-15 (D.I. 74).

[49] JX-241 (E-mail from Xu, to Kraus, Re: Notification – Action Needed {[Parexel]} (Oct. 8, 2019)) ("We will do our ABSOLUTE best to pay the invoices as soon as we complete our next financing. In the meantime, please provide the minimum support we need for this XYN-602 study."); JX-245 (E-mail from Jason Wu ("Wu"), Chief Operating Officer, Xynomic Pharms., Inc., to Scott, Re: Fw: XYN-602 Trial Discussion (Nov. 7, 2019)).

[50] Am. Compl. (D.I. 15).

[51] Am. Compl. ¶¶ 69, 103; Parexel's Post-Trial Br. at 35. This figure excludes (i) the $2 million advance payment of the pass-through and investigator fees that was to be paid by Xynomic at the execution of Work Order 1; and (ii) the $1 million Xynomic paid Parexel in May 2019. *Id.* at 8 n.17.

order to Work Order 1 in or around April 2019 that reflected the additional responsibilities Parexel took on.[53]

Mr. Paronelli laid out the responsibilities of Parexel under Work Order 1 and how the contract provided for both regular monthly payments and milestone-based payments; the latter of these required Parexel to achieve certain performance milestones to receive compensation.[54] In addition to describing the milestone structure of the contract, Mr. Paronelli explained that the contract allowed Parexel to invoice Xynomic in advance for the investigator and pass-through fees.[55]

Mr. Paronelli told the Court that Parexel had performed services in China before Xynomic suspended Parexel's services there.[56] According to Mr. Paronelli, after Xynomic suspended Parexel's work in China, Parexel "met at the global level

---

[52] Trial Tr., Jan. 25, 2021 (Paronelli), at 21-24.

[53] *Id.* at 26-29 (citing JX-128 (E-mail from Zhang, to Francesco Paronelli ("Paronelli"), Senior Project Leader, Parexel Int'l (IRL) Ltd., Re: PXL240681_Xynomic_CO1_02Apr_2019.docx (Apr. 16, 2019))).

[54] *Id.* at 32-34.

[55] *Id.* at 35.

[56] *Id.* at 39, 42-44 ("Q: And how much work did Parexel perform in China? A: Mainly we created the basis or the ground to have the study run in China. We did enough for the main, the most important, the main site in China. We also obtained the authorizations, so we went through all the ground activities for these site[s]." (citing JX-305 (slide deck prepared for a meeting with Xynomic listing services Parexel performed))).

a couple of times and . . . organized several meeting[s] on the kind of one-to-one to transfer and to train our counterpart . . . on how to run the global study."[57]

In response to Xynomic's allegations that Parexel underperformed, or failed to perform in China, Mr. Paronelli admitted that "[t]here were some miscommunication or communication problem[s,]" but Parexel addressed those issues through staffing changes.[58] To Mr. Paronelli, any issue that remained was attributable to Xynomic.[59] Additionally, Mr. Paronelli testified that Parexel and Xynomic mutually agreed to stop performing activities in certain countries due to either: (1) a joint agreement to do so or, (2) Xynomic's failure to pay Parexel.[60] Specifically addressing services in the United Kingdom, Mr. Paronelli said that Xynomic and Parexel jointly agreed to "hold on activities . . . waiting for a new protocol to be created."[61]

Mr. Paronelli explained that, other than certain communications issues in China, Xynomic had not raised, either when they allegedly occurred or shortly

---

[57] *Id.* at 46 (citing JX-333 (E-mail from Hui Liu, Project Director, PPC, to numerous recipients, Re: Communication on XYN-602 (May 21, 2019))).

[58] *Id.* at 48.

[59] *Id.*

[60] *Id.* at 68.

[61] *Id.* at 76.

thereafter, any of the issues it now alleges against Parexel.[62] He also clarified that only after this litigation commenced did he learn of any complaints, besides the China study, that Xynomic had with Parexel's service or performance.[63]

Next, Parexel's Director of Project Leadership, Vineeta Prasad, described her interactions with Xynomic and what data Xynomic had access to.[64] Ms. Prasad testified that Parexel only billed Xynomic for the work Parexel actually performed in China.[65] Additionally, she said that, through the course of the clinical trial, Xynomic had access to the electronic trial master file for each study, and moreover was provided all necessary information, data, and vendor contracts.[66] Around September 2019, after Xynomic ended Parexel's work in China, Ms. Prasad said Parexel shut down access to the imaging database, but did not shut down access to

---

[62] *Id.* at 111-65; *see, e.g., id.* at 97 (testifying that Xynomic had not raised any issues with Pazopanib being classified as a Non-Investigational Medicinal Project); *id.* at 102 (testifying that Xynomic had not raised any issues with the Informed Consent Form given to trial participants before litigation).

[63] *Id.* at 165.

[64] Trial Tr., Jan. 25, 2021 (Prasad), at 201-05.

[65] *Id.* at 208-09.

[66] *Id.* at 210-14.

any safety-related data or information.[67]  Ms. Prasad confirmed that Xynomic never complained about the work performed by Parexel or about any of the invoices.[68]

On the second trial day, Erin Williams, Parexel's Senior Director and Global Head of Site Contracts, testified.[69]  Ms. Williams countered Xynomic's assertions about Parexel's billing practices.  Specifically, Ms. Williams testified that the United States clinical site agreement did not provide that Pazopanib, a drug used in the clinical trial, was within the standard of care.[70]  So, Pazopanib would not be covered by insurance and Xynomic was, therefore, contractually obligated to reimburse Parexel for this drug as a pass-through fee.[71]

Bradley McClellan, Parexel's Senior Finance Business Partner, then clarified the billing procedures under Work Order 1 and the MSA.[72]  Mr. McClellan explained that, as the contract was partially milestone-based, Parexel could not invoice Xynomic certain sums until certain milestones were achieved.[73]  Mr. McClellan described the investigator fees as the "expenses that confirm individual sites that are

---

[67]  *Id.* at 216.

[68]  *Id.* at 219.

[69]  Trial Tr., Jan. 26, 2021 (Williams), at 6-8.

[70]  *Id.* at 15-17.

[71]  *Id.*

[72]  *Id.* at 23-24 (McClellan).

[73]  *Id.* at 25, 32.

treating patients."[74] And he described the pass-through fees as those expenses incurred by third-parties, including Parexel employees.[75] Parexel makes no profit on either the investigator or pass-through fees.[76] And the invoices Parexel sent Xynomic included individual sites and individual expenses broken down to the "granular level."[77]

According to Mr. McClellan, under the MSA's dispute provision, Xynomic had ten days to dispute any invoiced charge, and if Xynomic didn't dispute an invoice, Parexel would, per the MSA's language, deem that invoice approved.[78] Mr. McClellan went through a number of invoices that Xynomic never objected to.[79]

As to the investigator and pass-through fees, Mr. McClellan recounted that the contract provides that Parexel invoice each of these $1 million fees in advance, yet Xynomic paid neither of those advance fees.[80]

---

[74] *Id.* Examples of these fees include lab visits, lab fees, and any site visits or expenses.

[75] *Id.* at 26-27.

[76] *Id.* at 26-28.

[77] *Id.* at 26.

[78] *Id.* at 29 (citing JX-252 (MSA § 4.2)).

[79] *Id.* at 45.

[80] *Id.* at 33.

Next, Ronald Kraus, former Corporate Vice President and Head of Global Project Leadership for Parexel, outlined Xynomic's outstanding payments due.[81] And Mr. Kraus confirmed that Xynomic never raised any Parexel performance issues during the many pre-suit discussions trying to resolve its delinquencies.[82]

Mr. Kraus told of the April 16, 2019 phone call with Xynomic's Yinglin Mark Xu concerning Xynomic's next steps to pay Parexel for outstanding invoices. He recalled that Xynomic failed to make the payment that Mr. Xu promised for the following week of April 22, 2019.[83] Mr. Xu had then said Xynomic would start making all outstanding late-invoice payments during the week of May 15, 2019; it didn't.[84] Mr. Kraus acknowledged that Xynomic did pay some outstanding balances to Parexel, but that Xynomic was still well behind on its total outstanding invoices.[85]

As observed, Parexel sent Xynomic a Notice of Material Breach, which gave Xynomic thirty days to cure the alleged breach.[86] After this notice, Xynomic asked

---

[81]   *Id.* at 87-97 (Kraus).

[82]   *Id.* at 97.

[83]   *Id.* at 101-02; *see also* JX-140 (E-mail from Kraus, to Xu, Re: Follow up (Apr. 16, 2019)) (memorializing conversation).

[84]   Trial Tr., Jan. 26, 2021 (Kraus), at 113; *see* JX-155 (E-mail from Xu, to Kraus, Re: Quick update (May 20, 2019)).

[85]   Trial Tr., Jan. 26, 2021 (Kraus), at 116.

[86]   *Id.* at 119, 121 (citing JX-334 (Letter from Mahoney, to Zhang, Re: Notice of Material Breach of Master Services Agreement (May 24, 2019))).

Parexel to continue working on the clinical trials and promised it was raising the money to pay Parexel.[87]  Again, Mr. Kraus affirmed that Xynomic simply never raised concerns or issues with Parexel's performance—neither before nor after Parexel sent the Notice of Material Breach.[88]  The core of Mr. Kraus's testimony: Xynomic continued to promise to pay Parexel the full amount due, but that just never happened.[89]

Dr. Wentao Jason Wu, Xynomic's co-founder and its current Chief Operating Officer, took the stand to detail the clinical trials.[90]  According to Dr. Wu, Xynomic was dependent on Parexel's knowledge and connections in the countries where its trials were being conducted.[91]

Xynomic was obligated to pay monthly invoices that were separate from the milestone payments and were due each month regardless of the work performed.[92]  Dr. Wu offered that "if [he] ha[d] [the] chance to redo the contract, [he] wouldn't

---

[87]  *Id.* at 139-40.

[88]  *Id.* at 127.

[89]  *Id.* at 143.

[90]  *Id.* at 183, 192-93 (Wu).

[91]  *Id.* at 197.

[92]  *Id.* at 214-15.

-18-

construct the contract this way[,]" *i.e.* with monthly payments due regardless of work performed.[93]

According to Dr. Wu, Parexel didn't complete all the services required under Work Order 1.[94] He said he had difficulty communicating with Parexel's local team in China and he had brought those issues to Parexel.[95] He claimed to have met with Parexel's team and to have communicated some of the issues Xynomic had with Parexel's performance.[96]

Last, Dr. Wu testified that after Xynomic ended Parexel's work in China, Xynomic had asked Parexel to transfer some of the non-safety-related data to Xynomic. Dr. Wu told the Court that Parexel did that.[97]

On the last day of trial, Sophia Paspal, Xynomic's Chief Development Officer, gave her view of Parexel's performance of its contractual obligations.[98]

---

[93]   *Id.* at 215-16.

[94]   *Id.* at 217-18.

[95]   *Id.* at 219-21 (citing JX 361 (E-mail from Leigh Abbott ("Abbott"), Dir. of Clinical Operations, Xynomic Pharms., Inc., to Sara Leone, Parexel Int'l (IRL) Ltd., Action Required: Xynomic XYN-602 China PL Change Request (July 19, 2018))); *id.* at 224 (citing JX-360 (E-mail from Magdalena Wianecka-Skoczen, Clinical Operation Leader, Parexel Int'l (IRL) Ltd., to Abbott, Re: Xynomic XYN-602 Recruitment Requirements (July 26, 2018))); *id.* at 225-26 (citing JX-285 (E-mail from Paronelli, to Abbott, Xynomic China Discussion & Expectations (Aug. 3, 2018))).

[96]   *Id.* at 226, 229 (citing JX-255).

[97]   *Id.* at 235-37.

[98]   Trial Tr., Jan. 27, 2021 AM (Paspal), at 9-12.

-19-

Ms. Paspal pointed to the proposed timeline attached to Work Order 1 as evidencing what Xynomic had expected Parexel to perform and when those things were expected.[99] Specifically, Ms. Paspal testified to a March 2019 invoice from Parexel that showed 25% of sites had been initiated. According to Ms. Paspal, Xynomic expected all sites to have been initiated by then.[100] In addition, Ms. Paspal used the March 2019 invoices as exemplars of Parexel's invoices that, in her view, failed to provide sufficient detail to justify the charges within.[101]

Concerning services in China, Ms. Paspal said there were no initiated sites or patients enrolled there.[102] Concerning services in the United Kingdom, Ms. Paspal believed that five sites were supposed to have been initiated, but that none were.[103] Ms. Paspal told the Court that the United Kingdom's regulatory authority denied Parexel's submission for Xynomic's study because Parexel misclassified the investigational medicinal product.[104] And no sites were initiated in

---

[99] *Id.* at 25 (citing JX-15).

[100] *Id.* at 28-29.

[101] *Id.* at 30-31.

[102] *Id.* at 31-32.

[103] *Id.* at 33-34.

[104] *Id.* at 34 (citing JX-77 (Notice of Grounds for Non-Acceptance and Right to Amend Request)).

France, Italy, or the Czech Republic, Ms. Paspal declared, because Parexel allegedly failed to properly submit Xynomic's clinical trial package.[105]

Last, Ms. Paspal complained that, after Parexel left the China study, Parexel gave Xynomic no access to the data collected during the parties' relationship except for certain safety-related data.[106]

Another Xynomic co-founder who is now its Chairman and Chief Executive Officer, Yinglin Mark Xu, then recounted how Parexel was selected to conduct the clinical trials and explained Xynomic's expectation of Parexel's performance.[107]

Mr. Xu said Parexel promised "that a lot of work would be done front ended."[108] According to Mr. Xu, Parexel was to have started on all seventy-five sites by the end of July 2018, but, come seven months later, had delivered only 25% of the sites. So, he purported, Parexel was "nine months late and 75 percent underperformed."[109] Mr. Xu deponed that Xynomic selected another clinical research organization for China and it was able to open sites there.[110]

---

[105] *Id.* at 36.

[106] *Id.* at 74-75.

[107] *Id*. at 116-17, 120-22 (Xu).

[108] *Id.* at 133.

[109] *Id.* at 134.

[110] Trial Tr., Jan. 27, 2021 PM (Xu), at 5 (D.I. 74).

Mr. Xu told the Court that Xynomic paid Parexel $1 million in May 2019, and that as of May 27, 2019, it had paid Parexel $4.56 million.[111] He claimed that, in an email he sent to Mr. Kraus, he asked for a 25% discount, which—while not stated in the email—was to account for Parexel's poor performance.[112]

Joseph Scott, former Senior Vice President of Finance at Parexel, was the final trial witness. He recounted his communications with Xynomic about the payments due.[113] During the many phone and email conversations Mr. Scott had with Mr. Xu, the latter never mentioned Parexel's performance issues.[114] Instead, Mr. Xu gave his approval for Parexel to use the $1 million Xynomic had paid Parexel to offset outstanding invoices.[115] And Mr. Scott confirmed that Mr. Xu's reason for Xynomic's non-payment was "[c]ontinuing operating cash flow challenges and working capital issues."[116] Neither Mr. Xu nor anyone else at Xynomic ever told

---

[111] *Id.* at 12.

[112] *Id.* at 13-14 (citing JX-160).

[113] *Id*. at 56-58 (Scott).

[114] *Id.* at 61-63 (citing JX-153 (E-mail from Xu, to Scott, Re: Follow-up (May 8, 2019))); *id.* at 67 (citing JX-175 (E-mail from Xu, to Kraus, Re: Discount (June 4, 2019))); *id.* at 68 (citing JX-200 (E-mail from James Tong ("Tong"), Bison Holding, to Kraus, Re: Xynomic[/]Parexel Call (July 18, 2019))); *id.* at 73.

[115] *Id.* at 65-66 (citing JX-179).

[116] *Id.* at 73.

him that Xynomic "was withholding payment of unpaid invoices because of the performance issues[.]"[117]

## IV. GENERAL LEGAL PRINCIPLES

Though the Court sits without a jury, it has applied the same principles of law in its deliberations and consideration of each individual claim and counterclaim that it would have more formally instructed a jury to follow. The Court may highlight here some of those that are most applicable to this particular case. But the fact that some particular point or concept may be mentioned here should not be regarded as any indication that the Court did not—during its deliberations—consider all legal principles applicable to this case and to the parties' claims and counterclaims.

In reaching its verdict, the Court has examined the joint exhibits submitted and considered the testimony of all witnesses, both direct and cross. The Court has also considered the applicable Delaware case law that has defined the legal precepts applicable to the claims and defenses the parties have forwarded. The Court has applied the Delaware Rules of Evidence to the testimony and exhibits and only used for its deliberation that which would be allowed under those rules—consistent with the Court's knowledge of those rules and the specific rulings that may have been made and articulated both pre-trial, during the trial proceedings, and post-trial. And,

---

[117] *Id.* at 74.

of course, the Court has considered each party's respective arguments on the weight to be accorded the testimony and evidence.

The Court then reviewed and applied the very instructions that it would give a jury in these circumstances.[118]

In this particular case, Parexel carries the burden of proof by a preponderance[119] of the evidence on the only remaining claim, Count I (Breach of Work Order 1), in its Complaint.

## V. FINDINGS AND VERDICT

"To recover on a breach[-]of[-]contract claim, a party must prove the existence of an enforceable contract; the party performed or was ready to perform; that the other contracting party failed to perform; and that the failure to perform caused damages."[120]  The parties agree they had a valid contract.  So, the three contentions to be resolved here are: (1) whether Parexel performed under the MSA

---

[118] *See, e.g.,* Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[119] *See e.g.*, *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *accord Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984).

[120] *Gerstley v. Mayer*, 2015 WL 756981, at *5 (Del. Super. Ct. Feb. 11, 2015) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

and Work Order 1; (2) whether Xynomic breached the MSA and Work Order 1; and (3) whether Parexel supported its alleged damages.

## A. PAREXEL PERFORMED UNDER THE MSA AND WORK ORDER 1.

Parexel contends that it performed under the MSA and Work Order 1 and that Xynomic never raised any issues with Parexel's performance or its invoices before this litigation proceeded.[121] As such, it asks the Court to enter judgment in its favor and award it damages in the amount of the total outstanding invoices, $5,530,609.30, and also pre- and post-judgment interest.[122]

Xynomic says that Parexel failed to perform under the contracts and deserves no recovery.[123] Xynomic's complaints about Parexel's supposed deficient performance (or non-performance) come down to: (1) minor incidents stitched together to try to fabricate a material breach; and (2) a suggestion that Parexel didn't adhere to Xynomic's expected performance timeline. To determine whether Parexel performed under the contract and deserves payment, the Court has examined Xynomic's allegations and see whether Xynomic could be excused from performance because of Parexel's alleged material breach.[124]

---

[121] Parexel's Post-Trial Br. at 1-3.

[122] *Id.* at 5.

[123] Xynomic's Post-Trial Br. at 1.

[124] *E.g.*, *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003) ("A party is excused from performance under a contract if the other party is in material breach thereof.").

**1. Xynomic did not exercise its contracted-for avenues of contesting Parexel's alleged deficient performance and deficient invoices.**

Section 4.2 of the MSA provided Xynomic a mechanism for challenging Parexel's invoices, and Section 18 gave Xynomic the ability to elevate such a challenge through a dispute resolution procedure.[125]   Specifically, Section 4.2 provides:

> All invoiced amounts for Services performed in accordance with the terms and conditions of this Agreement and any Work Order are due net thirty (30) days from the receipt of PAREXEL's electronic invoice.  If [Xynomic] identifies items in an invoice which are disputed, [Xynomic] will notify PAREXEL in writing, noting its objection to the disputed item(s) with specificity, within ten (10) working days of the date of the invoice.  All items that are not disputed by [Xynomic] in writing within such period shall be deemed to have been approved by [Xynomic].  All disputes of which [Xynomic] notifies PAREXEL in accordance with this Section shall be addressed as set forth in Section 18 below.   [Xynomic] will pay any undisputed portions of any invoice per the agreed upon payment terms. [Xynomic] will pay interest on any unpaid invoice (including any undisputed portion of a disputed invoice) at the rate of one percent (1%) per month until such invoice(s) is paid in full.  Payments will be made to PAREXEL in accordance with the instructions set forth in the applicable Work Order or such other written instructions as may be provided by PAREXEL from time to time.[126]

And Section 18.1 provides:

> If a dispute arises between the parties relating to this Agreement or any Work Order, the parties to this Agreement or such Work

---

[125]  JX-252 (MSA §§ 4.2, 18).

[126]  JX-252 (MSA § 4.2).

> Order will meet and attempt to resolve the dispute in good faith. In the event the dispute is not resolved through negotiation within ten (10) business days after said meeting, the parties will submit to confidential, nonbinding mediation before a mutually acceptable mediator. Each party will designate at least one corporate officer with full authority to resolve the dispute who will attend and participate in the mediation. If the dispute remains unresolved after mediation, then each party will be free to pursue any available remedy at law or in equity.[127]

In short, after Xynomic received an invoice, it had a ten-day window to raise any objections. If Xynomic didn't object within this ten-day window, the invoice was deemed approved, and twenty days later (thirty days after the invoice was sent) the undisputed portions of the invoice became due.

According to Xynomic, it could not exercise its contractual rights to challenge the invoices it received because Parexel "did not provide any detail or back up."[128] As Xynomic tells it, it just didn't know what it was paying for.[129]

Xynomic says that it only agreed to these contractual terms because of its "lack of experience at the time the MSA and [Work Order 1] were signed."[130] That might account for Xynomic's initial acceptance of the terms. But it does nothing to explain why Xynomic didn't challenge Parexel's billing under Section 4.2 or elevate

---

[127] JX-252 (MSA § 18.1).

[128] Xynomic's Post-Trial Br. at 41.

[129] *Id.*

[130] *Id.* at 21 (citing Trial Tr., Jan. 26, 2021 (Wu), at 215-16).

any issue to dispute resolution as provided in Section 18. Instead, Xynomic blithely maintains that it was just "impossible to ascertain what work Parexel had actually completed within ten days of receipt of an invoice[.]"[131]

So Xynomic had the contractual right to challenge the invoices, but it failed to do so. Xynomic also had the ability to contemporaneously voice its performance issues with Parexel, but it failed to do so. When asked why, Xynomic answers: it "need[ed] to keep Parexel involved in the project."[132] Xynomic's previous silence would indicate consent to Parexel's performance—*i.e.*, there really was nothing wrong on Parexel's side. And, having considered all the evidence and testimony, that previous silence is a strong indicator of Xynomic's concoction of post-hoc rationales for non-payment as defenses to this action. That is, Xynomic's now-minted allegations of Parexel's deficient performance and deficient invoices seem conveniently contrived and give Xynomic no cover here.

### 2. Parexel did not materially breach the MSA or Work Order 1.

Once litigation commenced, Xynomic started complaining about Parexel's performance. Now, according to Xynomic, Parexel's performance under Work Order 1 was inexcusably deficient. It calls out certain discrete "failures" under Work

---

[131] *Id.*

[132] *Id.* at 24 ("Xynomic may not have raised specific issues with Parexel's performance during these financial communications, as described above, due to Xynomic's need to keep Parexel involved in the project.").

Order 1, including Parexel's alleged failure:  to provide Site Initiation Visits and corresponding reports to Xynomic; to deliver an adequate and workable model Informed Consent Form; and, to review safety data listings, including failure to deliver documents to demonstrate whether monitoring was being completed.[133] Xynomic argues that these, "in addition to the failures in China, resulted in the non-delivery of approximately 40 of the 75 anticipated sites, 5 out of the 9 anticipated countries involved, and most of the 413 patients to be enrolled."[134]  Similar to Xynomic's reason for not asserting its right to challenge the invoices, Xynomic says that it didn't raise performance concerns with Parexel because of  its "need to keep Parexel involved in the project."[135]  Xynomic goes further, saying it was "held captive by Parexel."[136]  And that "Parexel took advantage of Xynomic's dependence on its services – knowing that Xynomic could not complete the study without Parexel, Parexel continued to bill for services not performed."[137]

---

[133] *Id.* at 34.

[134] *Id.* at 34-35.  It's important to keep in mind that, by the time Parexel completely halted all work on Work Order 1 (due to persistent non-payment), the parties were less than two years into a five-year contract.

[135] *Id.* at 24.

[136] *Id.* at 22 (internal quotation marks omitted).

[137] *Id.*

Xynomic asserts, and Parexel acknowledges, that some performance issues were raised concerning China; the credible evidence demonstrates that, when noticed, Parexel sought to remedied those issues.[138] But as to any other alleged performance issues, Xynomic admits it never raised those with Parexel explicitly. And it now asks the Court to read between the lines in email conversations between the parties.[139]

The Court finds Xynomic's tardy claims of deficient performance unavailing. Xynomic has—through both trial and post-trial briefing—failed to present any credible evidence supporting its protestation of material breach by Parexel or its own powerlessness to call Parexel on such material breach as it was supposedly occurring. Indeed, aside from operations in China, the record is devoid of any contemporaneous complaints regarding performance, any use of the performance dispute procedures outlined in the MSA, or anything to show that these alleged failures existed at the time Xynomic now says they were so obvious.[140] But what

---

[138] Trial Tr., Jan. 25, 2021 (Paronelli), at 48.

[139] Xu testified that, while not explicitly stated, he had sought a 25% discount on outstanding payments because of Parexel's performance. Trial Tr., Jan. 27, 2021 PM (Xu), at 13-14 (citing JX-160).

[140] *See* Trial Tr., Jan. 25, 2021 (Prasad), at 219 ("Q: Prior to this litigation, did anyone at Xynomic ever tell you that they weren't paying Parexel's invoices because they were dissatisfied with performance? A: No. This never came up with my discussions with Sophia or even Melanie. Q: Ever even a suggestion that this was the case? A: No."); Trial Tr., Jan. 26, 2021 (Kraus), at 151 ("Q: Did anyone at Xynomic ever tell you Xynomic was withholding payment of the unpaid invoices because of performance issues? A: No one from Xynomic."); Trial Tr., Jan. 27, 2021 PM (Xu), at 37 ("Q: Is it your testimony, sir, that you at any point communicated to Parexel in any

the record does bear is Xynomic's repeated failure to engage the MSA's dispute methods, its promises to pay, its statements regarding lack of adequate funding, and its pleas to keep Parexel on its projects.[141]

of these e-mails that you sent that you wanted a discount based on performance issues? A: I didn't mention performance issues in the e-mails."); *Id.* at 74 (Scott) ("Q: Did anyone at Xynomic ever tell you Xynomic was withholding payment of the unpaid invoices because of performance issues? A.: No, they did not.").

Now, Xynomic did produce evidence of the rejected United Kingdom regulatory application. *See* JX-77 (Notice of Grounds for Non-Acceptance and Right to Amend Request). But this one discrepancy—which Parexel would have had time to correct but for the MSA's early termination due to Xynomic's persistent non-payment—is no material breach. *See* Parexel's Post-Trial Ans. Br. at 26, Apr. 16, 2021 (D.I. 72) ("Parexel could have, and would have, revised the package consistent with the regulatory authority's comments, but it was forced to terminate the MSA before it had the chance."); *see also BioLife*, 838 A.2d at 278 ("The question [of] whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree and is determined by weighing the consequences. . . ." (internal quotation marks omitted)); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. L. INST. 1981) (enumerating factors).

[141] PSO ¶¶ 34-84, 109; JX-106 (Xu's proposal of a new payment schedule); JX-117 (Xu's proposal of a another payment schedule); JX-119 (Xu's proposal of a another payment schedule); JX-140 (email from Xu to Kraus memorializing conversation); JX-155 (Xu: "I will start making payments this week."); JX-167 (Xu proposing to pay of all invoices by June 28, 2019); JX-180 (Xu stating that Xynomic remained "committed to pay the outstanding invoices by the end of June"); JX-213 (E-mail from Tong, to Kraus, Re: Call regarding the most recent updates (Aug. 6, 2019)) ("Mark and I have been gathering the funding source to suffice the payment. Our plan is to pay as much as what is available on the company's account and pay the remainder as soon as additional cash is raised or loaned to the company."); JX-241 (Xu: "We will do our ABSOLUTE best to pay the invoices as soon as we complete our next financing. In the meantime, please provide the minimum support we need for this XYN-602 study."); JX-241 (Xu: "Thank you for the continuous support. We will provide more frequent and substantive update[s] regarding our ongoing financing."); JX-245 (Wu: "Second, on behalf of Xynomic['s] operation team, I also want to express our sincere gratitude for Parexel's support of our RCC study . . ., particularly during our financial[ly] difficult period starting from early this year. I am now working closely with our CEO and the finance team on the company's fund raising activity. I am confident we will get this round done soon. . . . Right now all I would like to ask Parexel is to keep minimum work on this project. . . ."); Trial Tr., Jan. 26, 2021 (Kraus), at 97, 101-02, 113, 139-40.

One last point here: Xynomic's cries of being beholden to Parexel and needing to keep Parexel on the project ring hollow. When Xynomic terminated Parexel's services in China, it almost seamlessly replaced Parexel with a new clinical research organization that was able to open clinical sites there.[142]

### 3. Parties' failure to meet certain timelines does not constitute material breach.

Xynomic says Parexel failed to perform because it did not meet Work Order 1's proposed timeline.[143] Specifically, Xynomic asserts that, because it is a start-up biopharmaceutical company, any delay could cause Xynomic to incur more expenses, which, in turn, could impact its existence as a business.[144] In effect, Xynomic wants the Court to enforce an otherwise unwritten and unbargained-for time-of-the-essence requirement here.[145] But this, the Court cannot do.

Xynomic can't point to a single MSA or Work Order 1 provision that explicitly states time is of the essence. Instead, Xynomic relies on Exhibit C of Work Order 1—the estimated timeline between the parties.[146] But, as Exhibit C's name

---

[142] Trial Tr., Jan. 27, 2021 PM (Xu), at 5.

[143] Xynomic's Post-Trial Br. at 19; *see* JX-15 (Work Order 1 Ex. C).

[144] Xynomic's Post-Trial Br. at 33-35.

[145] *Id.* at 33.

[146] *Id.* at 35; *see* JX-15.

itself suggests, this timeline was "estimated." It set no deadlines. And it certainly cannot be read as engrafting an enforceable time-of-the-essence clause into the MSA or Work Order 1.

Delaware "law presumes contracting parties are familiar with time of the essence clauses and that they know how to make time of the essence if they so desire, especially in contracts between sophisticated business[es]."[147] While Xynomic contends that it was naïve to the MSA's contractual terms and obligations, and that Parexel took advantage of Xynomic's ignorance, this is not Xynomic's (and its principals') first time around the drug trial block.[148] Xynomic's two co-founders, Wentao Jason Wu and Yinglin Mark Xu, have significant experience working in the pharmaceutical industry and had each previously worked for or with industry-leading drug companies.[149] As such, the parties are experienced and sophisticated enough in the industry that if they intended to make time of the essence, they could and would have done so.[150]

---

[147] *HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *10 (Del. Ch. May 2, 2007).

[148] Xynomic's Post-Trial Br. at 22.

[149] Trial Tr., Jan. 26, 2021 (Wu), at 183-85; Trial Tr., Jan. 27, 2021 AM (Xu), at 116-17.

[150] *See W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007) ("The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations."), *aff'd*, 2009 WL 4154356 (Del. Nov. 24, 2009).

-33-

The facts here are similar to those in *HIFN, Inc. v. Intel Corp.*, where Intel asserted that the Court of Chancery should read a time of the essence clause into the parties' contract governing certain technology development.[151] The *HIFN* court rightly observed that "judicially insert[ing] a time is of the essence clause automatically into every contract . . . would be inconsistent with fundamental rules of contract interpretation."[152] Even more so here. These parties directly spoke to the element of time in their scrivening. And they decided to set forth estimated timelines, not hard deadlines backed with time-of-the-essence verbiage.

Not to be deterred, Xynomic continues its time-of-the-essence contention with the suggestion that Parexel's complained-of delay was unreasonable.[153] Here, Xynomic again turns to *HIFN, Inc.* It argues that a court can—even absent an express time-of-the-essence provision in the contracting papers—find that a party failed to perform when it did not complete its obligations in a reasonable time.[154] Perhaps so, under the right circumstances. But *HIFN, Inc.* provides a good example of what those circumstances might be. There, the Court of Chancery concluded that HFIN hadn't performed in a reasonable time only after finding that HIFN spent three

---

[151]  *HIFN, Inc.*, 2007 WL 1309376, at *11.

[152]  *Id.*

[153]  Xynomic Post-Trial Br. at 20.

[154]  *Id.* at 37 (citing *HIFN, Inc.*, 2007 WL 1309376, at *17).

times as long to fulfill its contractual obligations than was expected and after finding further that "failure to perform was not caused in any way by Intel's alleged repudiation."[155]

Not so here. Here, the parties' expected timeline was delayed by Xynomic's failure to pay and with the parties' mutual assent.[156] What's more, Xynomic has failed to demonstrate what would have been a reasonable time period for performance; it's said only that Parexel should have known time was of the essence. As such, Xynomic has not proven that any delay was outside of "reasonable time" and, therefore, has not shown Parexel materially breached the MSA or Work Order 1.[157]

---

[155] *HIFN, Inc.*, 2007 WL 1309376, at \*17.

[156] Parexel's Post-Trial Br. at 28-29.

[157] Further sinking Xynomic's claim here is the fact that even Exhibit C's timeline was by its own terms in its infancy. When litigation arose in July 2019, the parties were less than 18 months into a five-year contract. By then, Parexel only had the opportunity to meet three out of the eleven tasks outlined in Exhibit C. And the only then-expected task that the Court can see wasn't met was the Site Initiation goal that was to be completed on July 29, 2018. That reached 25% completion in March 2019. Trial Tr., Jan. 27, 2021 AM (Paspal), at 28; JX-116. But Xynomic had no issue with this delay. In March 2019, when Parexel did complete 25% of the Site Initiation, it billed Xynomic for that milestone. JX-116. Xynomic neither objected to the billing of this milestone nor claimed its competition was untimely. No, Xynomic just continued to say it would pay this bill (as it did all others) when it had its finances straightened out.

## B. XYNOMIC MATERIALLY BREACHED THE CONTRACT.

Xynomic admits it didn't pay Parexel. Xynomic has tried to defend that failure by decrying what it says was Parexel's alleged deficient performance.[158] Of course, for Xynomic to have any success, it would need to demonstrate that Parexel materially breached the contracts.[159] And, of course, the Court just found that Parexel didn't. So none of Xynomic's contracted-for performance obligations (*i.e.*, payment) can be excused on that basis. Accordingly, the question remaining for the Court to now resolve is whether Xynomic's failure to pay was a material breach of the subject contracts.

This Court has adopted the Restatement (Second) of Contracts for determining whether a breach is material.[160] Restatement (Second) of Contracts, § 241 provides:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a)   the extent to which the injured party will be deprived of the benefit which he reasonably expected;

---

[158] Xynomic's Post-Tr. Br. at 37.

[159] *Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006) ("[A] party in material breach of the contract cannot then complain if the other party fails to perform.").

[160] *E.g.*, *id.*

(b)  the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c)  the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)  the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e)  the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[161]

Xynomic materially breached the MSA and Work Order 1. Simply put, Xynomic continually promised to pay Parexel for its outstanding invoices but never did.[162] Xynomic's repeated excuse for not paying those invoices: internal funding issues. Yet, when Parexel's forbearance finally ended and it sued for Xynomic's persistent non-payment, Xynomic dropped its funding-issues excuse and went on offense, complaining for the first time of Parexel's alleged performance deficiencies.[163]

---

[161]  RESTATEMENT (SECOND) OF CONTRACTS § 241.

[162]  *See, e.g.*, JX-106, JX-117; JXs-119-23 (series of emails between Xu and Scott on proposed payment schedule); JX-155; JX-167; JX-180; JX-213; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. a (The materiality standard "is to be applied . . . in such a way as to further the purpose of securing for each party his expectation of an exchange of performances."); RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. b ("[A]n important circumstance in determining whether a failure [to perform] is material is the extent to which the injured party will be deprived of the benefit [that] he reasonably expected from the exchange.").

[163]  Trial Tr., Jan. 26, 2021 (Kraus), at 147; JX-241; Xynomic's Post-Trial Br. at 23.

No doubt, Xynomic's chronic failure to pay the invoices owed to Parexel, after many assurances of payment, constitutes a material breach.

## C. PAREXEL SUPPORTED ITS ALLEGED DAMAGES.

To succeed on its breach-of-contract claim, Parexel must prove damages stemming from the breach.[164] Here, Parexel presents a number of invoices sent to Xynomic, which were deemed accepted under the terms of the MSA but still went unpaid.[165] Parexel presents a breakdown of the figures and types of payments due under each invoice.[166] Parexel is seeking:

(1) Nine monthly payments for August 2018, September 2018, and December 2018 through June 2019, totaling 1,687.482.00;[167]

(2) Three milestone payments for the following: (a) $1,200,000 for the Start of the Work Order; (b) $300,000 for reaching 25% of Sites Initiated; and (c) $1,476,548 for the First Patient Enrolled, totaling $2,976,548.00;[168] and

---

[164] *E.g.*, *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 (Del. 2016) ("[A] cause of action for breach of contract includes damages as an element.").

[165] Parexel's Post-Trial Br. at 9-12.

[166] *Id.* at 7-13.

[167] *Id.* at 12-13; JX-46 (Month Service Fees for Aug. and Sept. 2018); JX-79 (Monthly Service Fee for Dec. 2018); JX-89 (Monthly Service Fee for Jan. 2019); JX-105 (Monthly Service Fee for Feb. 2019); JX-116 (Monthly Service Fee for Mar. 2019); JX-143 (Monthly Service Fee for Apr. 2019); JX-163 (Monthly Service Fee for May 2019); JX-187 (Monthly Service Fee for June 2019); *see also* Parexel's Post-Trial Br. at 12 n.48 ("Xynomic paid the monthly service fees for October 2018 and November 2018").

[168] JX-45, JX-116; *see also* JX-15 (Work Order 1, Ex. G).

(3)   Pass-through fees totaling 1,866,579.30.[169]

The total amount due under these invoices is $6,530,609.30.  This amount is reduced by two $500,000 payments made by Xynomic in May 2019, adjusting Parexel's sought damages to $5,530,609.30.[170]

## 1.  Monthly Invoices.

As Xynomic sees it, Parexel's invoices—which are the basis for its damages claim—are "based entirely on assumptions contained in Exhibit A to Work Order 1 that were not met[,]" so Parexel isn't entitled to damages.[171]   Too, according to Xynomic, the parties never executed a change order to reflect Xynomic's termination of Parexel's work in China, so the monthly invoiced totals are not accurate.[172]

---

[169] Parexel's Post-Trial Br.  at 13; JX-62; JX 68; JX-90; JX-91, JX-114;  JX-115; JX-145; JX-146; JX-170; JX-171; JX-185; JX-186; JX-220; JX-226; JX-227; JX-228; JX-230.  Parexel also states that, separate to the invoice, it provided back-up information identifying each specific expense for which it was seeking reimbursement. Parexel's Post-Trial Br. at 13; *see* JX-62; JX-87; JX-88; JX-112; JX-113; JX-141; JX-142; JX-168; JX-169; JX-182; JX-183; JX-218; JX-223; JX-224; JX-225; JX-229.

[170] Parexel's Post-Trial Br. at 8, 14-15.

[171]  Xynomic's Post-Trial Br. at 41.

[172]  *Id.* at 38-39.

Parexel says that it was forced to halt opening sites and enrolling patients because of Xynomic's repeated failures to pay its bills.[173] And so it was Xynomic's own failure that caused the delayed timeline.[174]

The Court must determine whether Parexel properly invoiced Xynomic for assumptions that were made, but not met, under Work Order 1 and whether Parexel's invoices sent to Xynomic after it terminated Parexel's work in China were accurate.

Xynomic and Parexel executed a contract, and subsequent work orders, under which Xynomic took on three types of payment obligations: "milestone payments, monthly payments, and reimbursement for pass[-]through expenses[.]"[175] Both sides agree, the monthly invoices weren't contingent on any event or milestone but were due every month regardless of the actual work completed.[176]

Xynomic says that, when it terminated Parexel's work in China, "no sites had been initiated in China, no patients had been enrolled in China, and no regulatory

---

[173] Parexel's Post-Trial Ans. Br. at 10-11 (citing JX-137).

[174] *Id.*

[175] Parexel's Post-Trial Br. at 6.

[176] *Id.*; Trial Tr., Jan. 26, 2021 (Wu), at 215. Xynomic's co-founder, Wentao Wu, testified to this understanding and added that "if [he] ha[d] [the] chance to redo the contract, [he] wouldn't construct the contract this way." *Id.*

approvals had been submitted by Parexel in China."[177]  This alleged inaction by Parexel, according to Xynomic, precludes Parexel from being awarded damages.[178]

Along with this, Xynomic argues that the fact that the monthly billing was not changed after Xynomic ended Parexel's work in China shows that the monthly invoices were inaccurate.[179]  Moreover, Xynomic contends that Parexel has not provided "any detailed basis for the services actually provided in connection with those invoices[.]"[180]

Parexel first disputes Xynomic's suggestion that, because no sites were opened or patients enrolled in China, Parexel didn't do any work.[181]  To the contrary, Parexel says that it laid the groundwork for its eventual opening of sites and enrollment of patients in China.[182]  And while it had not yet opened sites or enrolled patients, Parexel notes that it did perform services in China.[183]  And even after the April 2019 termination from China, Parexel maintains that it continued "working on

---

[177]  Xynomic's Post-Trial Ans. Br. at 5 (D.I. 73).

[178]  *Id.*

[179]  Xynomic's Post-Trial Br. at 42.

[180]  *Id.*

[181]  Parexel's Post-Trial Ans. Br. at 20-21.

[182]  *Id.* (citing Trial Tr., Jan. 25, 2021 (Prasad), at 229-30).

[183]  *Id.*

China sites/activities until the handover with the selected new CRO [was] completed."[184]

Next, Parexel disputes Xynomic's assertion that the parties never executed a change order that reflected Xynomic's termination of Parexel's work in China.[185] The parties did indeed execute a change order on April 15, 2019, contemporaneous with Xynomic's termination of Parexel's work in China.[186] As Parexel points out, Xynomic had already determined it would remove Parexel from China, so when it signed the change order it could have requested a lower monthly fee. Xynomic didn't.[187] No doubt, the monthly fees were in consideration of the parties' overall ongoing commitment and relationship that was meant to last five years—not the specific work completed in any given month or period. The latter was to be compensated upon the meeting of milestones.

Even if the parties' inclusion of monthly fees, regardless of work performed, was not as beneficial to Xynomic as it might have seemed, the Court cannot save Xynomic from its decision to agree to those terms.[188] Delaware courts "do not

---

[184] *Id.* at 29 (citing JX-274).

[185] *Id.* at 18.

[186] JX-111 (Form of Change Order); JX-274 (Xynomic terminating Parexel's services in China).

[187] Parexel's Post-Trial Ans. Br. at 18.

[188] *See, e.g.*, *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include

relieve [sophisticated parties] of the burden of [their contracts] simply because of their after-the-fact regrets. To do so would greatly undermine the utility of contracts."[189]

The Court finds that Parexel accurately invoiced Xynomic under Work Order 1 and that the invoices Parexel sent to Xynomic even after it terminated Parexel's work in China were, likewise, accurate.

## 2. Milestone Payments.

Concerning milestone payments, it's clear that Parexel only invoiced those upon Parexel's accomplishment of the milestones.[190] And Xynomic has conceded that those specific milestones billed-for were met.[191] Though Xynomic expected

---

superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008); *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both."); *W. Willow-Bay*, 2007 WL 3317551, at *9 ("[A] court will not disturb a bargain because, in retrospect, it appears to have been a poor one."), *aff'd*, 2009 WL 4154356; *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004) (Contracting parties cannot use litigation to extract "contractual protections that they failed to secure for themselves at the bargaining table.").

[189] *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.2d 738, 748 (Del. Ch. 2004). Furthermore, the record indicates that Parexel stopped billing Xynomic its monthly fee in June 2019. *See, e.g.*, Parexel's Post-Trial Br. at 10-11 (collecting invoices and billing statements).

[190] Parexel only billed for the three milestones it achieved: (1) $1,200,000 for the Start of the Work Order; (2) reaching 25% of Sites Initiated; and (3) the First Patient Enrolled milestone. JX-45, JX-116.

[191] Trial Tr., Jan. 26, 2021 (Wu) at 213-14 ("Q: Can you please tell us your understanding of what the milestone payments are supposed to be for? A: Well, milestone means once they reached the particular points that define[d] as . . . a milestone, they – the other party need[s] to pay according to the number that [is] listed here. So, for instance, . . . [t]here is a line called a first site initiated. That means[,] among all the global[] sites outlined in [the proposal] . . ., if the very first one site

Parexel to have initiated all sites by March 2019, Parexel didn't. And Parexel didn't invoice for any milestone not yet met.[192] Had it done so, Parexel would indeed be invoicing for work not completed. And that the written agreements would not allow. But, having only billed for the milestones it accomplished, and having confirmed the achievement of those milestones, Parexel has proven its damages thereon.

### 3. Pass-Through and Investigator Fees.

Xynomic argues that Parexel is double billing for the pass-through and investigator fees.[193] Under Exhibit G of Work Order 1, Xynomic was to make two advance payments of $1 million for the investigator and pass-through fees.[194] Xynomic never made those advance payments.[195] Up until trial, Parexel was seeking payment on those advance payments and on the pass-through and investigator fees

---

get[s] initiated, then we need to pay the $1.2 million, according to the schedule."); *id*. at 217 ("And I remember Parexel enrolled the first patient. That was in October . . . 2018."); Trial Tr., Jan. 27, 2021 PM (Xu), at 50 ("Parexel did deliver 19 sites.").

[192] Trial Tr., Jan. 27, 2021 AM (Paspal), at 28-29.

[193] Xynomic's Post-Trial Br. at 30.

[194] JX-116 (Work Order 1, Exhibit G).

[195] PSO ¶¶ 32-35.

it actually incurred.[196]  At trial, Parexel stipulated that it was no longer seeking payment of the two invoices for the advance payment of the fees.[197]

Xynomic doesn't dispute Parexel's right to collect the pass-through and investigator fees it actually incurred.  But Xynomic does maintain that Parexel cannot recover for the invoiced $2 million advance payments.[198]  Parexel agrees.  At trial, Parexel produced a reevaluated figure of $5.53 million, excluding the invoices for the $2 million advance payments, and has reaffirmed that lower sum throughout its post-trial briefing.[199]  Given that the amount of actually incurred pass-through and investigator fees is uncontested, and that Parexel has provided a breakdown of such fees, Parexel has proven its damages on those as well.

### D. ATTORNEY'S FEES

Parexel contends that it is entitled to attorney's fees under the bad faith exception to the American Rule.[200]  And Parexel cites to two instances of Xynomic's

---

[196] PSO ¶¶ 31-84 (original figure of unpaid invoices for Work Order 1 was $7, 408,256.24).

[197] Trial Tr., Jan. 26, 2021, at 83; *id.* at 177 ("Well, the position is that as of the time we filed . . . the litigation and the amended complaint [] that those invoices were unpaid.  And, as we have heard testimony through even the amended complaint, Xynomic was still asking Parexel to continue working on this project.  Therefore, those invoices were still outstanding, due, and payable.  Now that we are through the litigation and the study has concluded, Parexel is no longer doing any work, no one is doing any work on this, those invoices are now not due and payable.").

[198] Xynomic's Post-Trial Br. at 32-33 & n.4.

[199] Trial Tr., Jan. 26, 2021, at 177-78; Parexel's Post-Trial Br. at 8; Parexel's Post-Trial Ans. Br. at 28-29.

[200] Parexel's Post-Trial Br. at 32-33.

conduct that it says qualifies under that exception. *First*, Parexel claims that, by acknowledging that it owed Parexel money, but failing to identify the invoiced amounts in dispute, Xynomic wasted Parexel's time and money and needlessly prolonged this litigation.[201] *Second*, Parexel alleges that Xynomic's Chief Executive Officer, Yinglin Mark Xu, submitted a false, unsworn foreign declaration.[202]

Under the American Rule, it is generally presumed that each party will pay its own attorney's fees[203] unless the bad faith exception applies.[204] The bad faith exception applies only under "extraordinary circumstances."[205] It should not be invoked merely because some party's "allegations were disproven at trial."[206] Instead, the party seeking attorney's fees must show by "clear evidence" that the opposing party "acted in subjective bad faith."[207] This subjective bad faith must relate to those actions taken either in the "commencement of" or "during" litigation.[208]

---

[201] *Id.* at 33.

[202] *Id.* at 34.

[203] *E.g., Mahani v. Edix Media Grp., Inc.*, 935 A.3d 242, 245 (Del. 2007).

[204] *E.g.*, *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015)

[205] *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted).

[206] *Gen. Video Corp. v. Kertesz*, 2009 WL 106509, at *1 (Del. Ch. Jan. 13, 2009).

[207] *RBC Cap.*, 129 A.3d at 877 (internal quotation marks omitted).

According to Xynomic, this trial exposed the fact that Parexel hadn't engaged and provided the required reconciliation that would have avoided double billing had Xynomic not resisted and pressed its defense.[209] And as to Mr. Xu's declaration, Xynomic claims it was made to the "best of his knowledge at the time[,]" and not in bad faith.[210]

Under the American Rule, the bad faith inquiry is fact-intensive and reserved for the most serious and extraordinary circumstances that, if not sanctioned, would harm the judicial process.[211] The Court has examined the entire record in this matter and cannot find that Parexel's allegations, even if true, rise to a level justifying the award of such a serious sanction.[212] And so, no fee shifting is appropriate. Each party must pay its own attorney's fees.

---

[208] *Id.* (internal quotation marks omitted); *cf. Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010) ("Generally, the bad faith exception to the American Rule . . . does not apply to the conduct that gives rise to the substantive claim itself." (internal quotation marks omitted)).

[209] Xynomic's Post-Trial Ans. Br. at 12-13.

[210] *Id.* at 14-15.

[211] *Montgomery*, 880 A.2d at 227.

[212] *See Lawson v. State*, 91 A.3d 544, 552 (Del. 2014) ("The bad faith exception applies only in *extraordinary cases*, and the party seeking to invoke that exception must demonstrate [its applicability] by *clear evidence*. . . ." (emphasis added) (internal quotation marks and citation omitted)); *see also RBC Cap.*, 129 A.3d at 879 (observing that whether to shift fees using the bad faith exception "is a matter that is within the discretion of the trial judge" and explaining that a trial court does not "abuse [its] discretion" in shifting or not shifting fees just because another court "may have come to a different conclusion"); *see generally Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1222 (Del. 2012) ("[T]here is no single definition of bad faith conduct." (internal quotation marks omitted)); *cf. Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 & n.27 (Del. 1998) (giving "falsified records" as an example of bad faith, but also noting that

## E. PRE- AND POST-JUDGMENT INTEREST

A non-breaching party is entitled to pre- and post-judgment interest as a matter of right, and Delaware courts will not disturb that right.[213] When the parties have contractually expressed an interest rate, the Court will abide by that expressed interest rate.[214]

MSA Section 4.2 does provide that "[Xynomic] will pay interest on any unpaid invoice (including any undisputed portion of a disputed invoice) at the rate of one percent (1%) per month until such invoice(s) is paid in full."[215] And Parexel asks that interest rate be applied here.[216] Xynomic never responds to Parexel's

---

"insufficient proof that [the] documents in question were falsified" counsels against fee-shifting (citation omitted)).

[213] *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011) ("[I]n addition to the principle that prejudgment interest in Delaware cases is awarded as a matter of right, the general rule is that interest accumulates from the date payment was due the plaintiff, because full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance." (internal quotation marks omitted)); *see also Chaplake Holdings Ltd. v. Chrysler Corp.*, 2003 WL 22853462, at *4 (Del. Super. Ct. Oct. 30, 2003) ("Under Delaware law, pre-judgment and post-judgment interest on a debt is awarded as a matter of right and not of judicial discretion. Courts award pre-judgment and post-judgment interest to the prevailing injured party for the detention of damages." (internal quotation marks and citation omitted)).

[214] *Cf. Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 620 (Del. Ch. 2010) (computing the statutory ("default") interest rate because there was no "express contract rate" (citing DEL. CODE ANN. tit. 6, § 2301(a) (2020))), *aff'd sub nom.*, *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 750 (Del. 2010).

[215] JX-252 (MSA § 4.2).

[216] Parexel's Post-Trial Br. at 31-32.

invocation of Section 4.2—which the Court deems as Xynomic's concession to the rate's application.

Accordingly, Parexel is entitled to pre- and post-judgment interest at the rate of one percent (1%) per month of the unpaid invoices.

## VI. CONCLUSION

When it wasn't paying its accumulating bills, Xynomic engaged a check's-in-the-mail approach with Parexel. Once sued, Xynomic took a different tack. It now says, Parexel didn't earn those phantom checks.

In more formal legal terms, Xynomic's defense here has been that it was excused from any obligation to pay its outstanding invoices because Parexel either deficiently performed or failed to perform under the MSA and Work Order 1 to an extent that Parexel was in material breach of those agreements. Not so. Xynomic had the contractual right to challenge any invoice it wanted, and moreover was free to express issues with work performed or withheld. When asked why it didn't raise objections to Parexel's performance before now, the best Xynomic could offer was that it "need[ed] to keep Parexel involved in the project."[217]

But that begs the question of when, if ever, Xynomic was going to raise its supposed objections with Parexel. At best, Xynomic sat on its rights and, by not

---

[217] Xynomic's Post-Trial Br. at 24 ("Xynomic may not have raised specific issues with Parexel's performance during these financial communications, as described above, due to Xynomic's need to keep Parexel involved in the project.").

asserting its objections, agreed to the volume, substance, and quality of the work performed. At worst, Xynomic held valid performance complaints in its back pocket just waiting for litigation over non-payment. And at very worst, these dire performance issues were nothing more than the bumps expected along road to approval of a promising drug that are now being miscast to try to excuse Xynomic's failure to pay its toll. No matter which it is, Xynomic's free ride must now end.

In determining whether the elements of breach of contract were met, the Court credits the many witnesses who testified that Parexel consistently provided the consideration required and was performing in the manner agreed to. Though Xynomic claims that in certain instances Parexel was underperforming or not performing at all, the Court is unconvinced. Parexel did perform as required under the contracts, and Xynomic materially breached those same agreements by failing to pay its properly invoiced obligations thereunder.

As a result, Xynomic is ordered to pay Parexel $5,530,609.30 and the corresponding one percent (1%) pre- and post-judgment interest as derived from the contracts.

## VII. VERDICT AND JUDGMENT

**ON PAREXEL'S COMPLAINT**:

- Count I – Breach of Contract (Work Order 1):  For Parexel.

Parexel is entitled to pre- and post-judgment interest on Count I.  But Parexel is not entitled to its Attorney's Fees.

The parties shall confer and, within 15 days, submit to the Court a proposed form of Order of Final Judgment consistent with these findings and verdicts.

**IT IS SO ORDERED.**

_____
**Paul R. Wallace, Judge**

Original to Prothonotary
cc:  All counsel via File & Serve

-51-